153 U.S. 246
 14 S.Ct. 804
 38 L.Ed. 705
 In re CITY NAT. BANK OF FT. WORTH. April 30, 1894. This is an application for leave to file a petition for mandamus directing the circuit court of the United States for the northern district of Texas to vacate or modify a decree heretofore entered by that court in a certain cause therein pending, wherein Hunter and others were complainants, and the City National Bank of Ft. Worth, Tex., was defendant, on the ground that in rendering such decree the circuit court departed from the mandate of this court sent down on the disposition of an appeal from a former decree in the cause, as reported in Bank
v.
 Hunter, 129 U. S. 557, 9 Sup. Ct. 346. We do not feel required to restate the case, as set forth at length when it was then before us. Briefly, on May 20, 1880, one O'Neal was indebted to Hunter, Evans & Co., and also to the City National Bank, each of whom claimed to hold a lien, to secure the indebtedness, on certain cattle owned by O'Neal. One Dawson was desirous of purchasing the cattle, and the result was that the parties in interest entered into three written agreements, under which the cattle were sold and delivered to Dawson; he executing a note for the purchase price, payable to the order of Hunter & Co. and the bank, to be paid, and the proceeds distributed, according to certain terms and stipulations agreed on. The note was delivered, upon its execution, to Henry E. McCulloch, who was selected by Hunter & Co. and the bank as their joint agent to accom-
 
 [247]
 pany the cattle, and receive and distribute the proceeds as sales were made by Dawson. Certain amounts were received and distributed accordingly. Shortly after, and on May 31st, Hunter & Co. filed a petition in Montague county, Tex., against O'Neal and Dawson, to foreclose a mortgage given by O'Neal to them on the cattle then in possession of the latter, and sequestrated the cattle. Thereupon, Dawson replevied the cattle, and gave a bill of sale of them to the bank, which furnished the security upon the replevin bond, and agreed to hold the parties harmless from any liability thereon. The bank notified McCulloch that his agency had ceased, and took possession of the herd through its agent, one Ellis, who had a power of attorney from the bank to make title to the cattle as sold off by Dawson, and receive the proceeds. The suit of Hunter & Co. in Montague county was removed to the circuit court, and they there filed an amended bill, September 30, 1881, to which they made the bank a party defendant, and prayed in the alternative, that, if they were mistaken in seeking a foreclosure, a decree be rendered against Dawson and the bank for the amount of money coming to them from the proceeds of the cattle. The cause was heard in the circuit court and a decree rendered, which, upon appeal to this court by the bank, was reversed, and the cause remanded, with a direction to enter a decree in conformity with the opinion. The opinion found the amount due from O'Neal to Hunter & Co. February 20, 1880, to which certain interest was to be added, as pointed out, down to the date at which Dawson paid the balance due on his note into the bank,—a matter not made clear on that record,—and also directed the amount of the bank's debt to be ascertained by adding certain interest to O'Neal's note held by it down to the same date. From these two indebtednesses the pro rata to which complainants and the bank were entitled out of the fund to be distributed was to be computed, and, from the amount to come to complainants according to this computation, certain deductions were directed to be made, and the balance to be paid out of the money deposited by Dawson, as of the date of such deposit, the bank retaining the remainder. After the
 [248]
 cause was remanded the parties entered into the following stipulation: 'It is agreed between Hunter, Evans & Co., on the one part, and the City National Bank of Fort Worth, Texas, on the other part, that the proceeds of the cattle in controversy in this case were paid over to James F. Ellis, one of the securities on the replevin bond, who, for himself, and as agent for the other securities on said bond, accompanied said cattle to the Indian Territory, and collected the balance due on the note from Dawson to Hunter, Evans & Co. and said City National Bank, and that said Ellis, on behalf of himself and said other securities on said bond, deposited said amount collected by him in said City National Bank as a general deposit, with the understanding that said money should remain on deposit in said bank, to abide the determination of this suit, for the purpose of indemnifying them (said securities) against any loss by reason of their signing said bond. 'Said deposit was made in the name of the 'Dawson bond account,' and the amount has remained, and still remains, on general deposit, as aforesaid, in said bank. 'It is further agreed that said deposit was made at the following dates, and in the following amounts, respectively: '1. June 26th, 1880, three thousand one hundred and twenty-eight dollars. '2. August 3rd, 1880, five thousand dollars. '3. August 6th, 1880, five thousand six hundred and forty-four dollars. 'Total amount deposited, thirteen thousand seven hundred and seventy-two dollars, which, as other general deposits, has been used by the bank as other of its funds. 'It is further agreed that this agreement shall stand in lieu of answer to plaintiffs' bill of discovery, and answer to same is hereby waived.' The circuit court thereupon rendered a decree, providing, among other things, that Hunter & Co. recover of the bank the sum of $12,084.85, together with interest thereon from date of decree at the rate of 8 per cent. per annum, and the costs after September 30, 1881,—the date of the filing of
 [249]
 complainants' amended bill,—all prior costs being adjudged against Hunter & Co. The bank then prosecuted an appeal to this court, assigning as error that the circuit court included in the recovery against the bank interest on complainants' portion of the money, and awarded costs. The contention was that the allowance of the interest was inconsistent with the mandate of this court, and the amount thus questioned was 'nearly or quite $4,000. When the appeal came to be considered, we found ourselves compelled to dismiss it because the sum in dispute was not sufficient to give us jurisdiction, and no appeal lies from a mere decree for costs. Bank v. Hunter, 152 U. S. ——, 14 Sup. Ct. 675. A. H. Garland, for the motion. [Argument of Counsel from pages 249-251 intentionally omitted]
 [251]
 djQ Mr. Chief Justice FULLER delivered the opinion of the court. Application is now made for mandamus, and this is the proper remedy, if the mandate of this court has been disregarded; but, if not, the application for leave to file should be denied. We are of opinion that whether or not the proceeds of the cattle were received and retained by the bank under such circumstances as to render it liable to Hunter & Co. for interest on their pro rata share was a matter which was necessarily so far left at large by our former decree that we cannot hold that the mandate was disregarded by the decree rendered thereunder by the circuit court. The Dawson note was held in trust for Hunter & Co. and the bank, payment to be worked out from the cattle through the agency of McCulloch; and when the bank terminated McCulloch's agency, took possession of the herd, and received the proceeds of the cattle from Ellis, it received the pro rata share of Hunter & Co. in trust for them, as the litigation
 [252]
 turned out. And nothing in the directions we gave prevented the circuit court from holding the bank to a liability to pay interest thereon, if, in its judgment, it was justified in so doing by the facts disclosed on the hearing. Ellis was the agent of the bank, and the money was kept and used by the bank, being carried on the books to the credit of the 'Dawson bond account,' subject to the determination of this suit. The language of the stipulation—that the amount collected was deposited by Ellis as a 'general deposit,' and used 'as other general deposits,' 'as other of its funds'—does not change the legal effect of the transaction, so far as Hunter & Co. were concerned, who had nothing to do with the agreement of the bank to indemnify Dawson's sureties on the replevin bond. The use of their part of the money, under the circumstances, may have induced the circuit court to arrive at the result complained of. We are not, however, called on to say whether the allowance of the interest was or was not correct, as the only question is whether that court disobeyed the mandate, which we do not think it did. As to the costs, we are also clear that the action of the circuit court was not precluded by the former decision. Leave to file the petition must therefore be denied. Northern Pac R Co v. Clark [14SCt809,153US252,38LEd706] 14 S.Ct. 809 153 U.S. 252 38 L.Ed. 706 NORTHERN PAC. R. CO. v. CLARK et al., County Auditors.
 No. 1,045.
 April 30, 1894.
 This was a suit by the Northern Pacific Railroad Company against the county auditors of 12 counties in the state of North Dakota, to enjoin the collection of certain taxes, alleged to be illegal, assessed against its lands. The circuit court sustained a demurrer to the bill, and dismissed it for want of equity. Railroad Co. v. Walker, 47 Fed. 681. Complainant appealed to the circuit court of appeals for the eighth circuit, and that court certified the cause to this court for instructions on certain propositions of law. 3 C. C. A. 684. It was, however, remanded, because the jurisdiction of the circuit court did not appear upon the face of the record. Proper amendments were made, and the cause has again been certified up.
 This case, under the style of Railroad Co. v. Walker, 148 U. S. 391, 13 Sup. Ct. 650, was before this court at October term, 1892, and, the jurisdiction of the circuit court not appearing upon the face of the record, it was remanded with leave to amend. The appellant accordingly, on June 6, 1893, filed in the circuit court of the United States for the district of North Dakota its amended bill of complaint, in which, after setting forth its creation and organization under and by virtue of an act of congress approved July 2, 1864, entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound, on the Pacific coast, by the northern route,' and certain acts and joint resolutions of congress supplementary thereto and amendatory thereof, it was alleged that for the purposes of laying out, locating, constructing, furnishing, and maintaining a railroad and the telegraph line between the points indicated there was granted to it by congress every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of the railroad line as the company might adopt, through the territories of the United States, and 10 alternate sections of land per mile on each side of the railroad line whenever it passed through any state, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, free from pre-emption or all other claims at the time the line of the railroad should be definitely fixed, and the plat thereof be filed with the commissioner of the general land office; that the railroad company duly accepted the terms, conditions, and impositions of said act of congress, and that on the respective dates of May 26, 1873, and July 20, 1880, it definitely fixed the line of its railroad through certain counties in the territory of Dakota (now the state of North Dakota), and filed plats thereof in the office of the commissioner of the general land office; that the line of railroad so fixed extends opposite to and past the lands set forth and described in the schedules made a part of the bill; that prior to December 20, 1880, it had completed that portion of the railroad and telegraph line extending on, over, and along the line of definite location of the railroad; and that the president of the United States, from time to time, after the same had been examined by commissioners, had accepted the railroad and telegraph line as having been constructed and completed in all respects as required by the act of July 2, 1864, and the acts and joint resolutions supplementary and amendatory thereof.
 The bill further alleged that the lands on each side of the railroad, and every portion thereof, were within 40 miles of the company's line of road so definitely fixed; that they were public lands, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and no entry or application to make entry for the lands was made or was pending when the lists of definite location were filed in the office of the commissioner of the general land office on May 26, 1873, and July 20, 1880; that the described lands had been surveyed by United States surveyors, and had been reported to be agricultural in their character, and nonmineral; and that the lands were not, on July 2, 1864, or May 26, 1873, and July 20, 1880, known as mineral lands, etc.; that the company had, prior to the year 1889, in accordance with the direction of the secretary of the interior, duly prepared and filed lists in the United States land offices in the land districts in which the lands were situated, respectively, describing the lands, and claiming them as a portion inuring to it under and by virtue of the act of congress approved July 2, 1864, which lists were duly allowed and approved by the United States district land officers, to whom the fees prescribed by law were paid by the company, and which were retained by the United States; that the lists of lands so filed were duly transmitted by the district land officers to the commissioner of the general land office for his approval; that since the lists were filed and transmitted to the commissioner of the general land office, the commissioner, under the direction of the secretary of the interior, had required the company to file in the office of the commissioner, or in the office of the land-office districts in which the lands were respectively situated, an affidavit made by some person acquainted with the character of the lands, setting forth and showing that the same were nonmineral, and that, until such affidavits had been filed, the commissioner refused to approve the lists; that the company had not, nor had any one in its behalf, filed affidavits of persons having knowledge of the mineral or nonmineral character of the lands set out in the lists.
 The bill then proceeds to state that none of the lands described had ever been certified or patented to the railroad company, and that neither the United States nor any of its officers or agents had ever ascertained and determined what specific lands in the state of North Dakota passed to the railroad company by virtue on the act of July 2, 1864, although the railroad company had repeatedly petitioned to have this done; that the United States and its officers had refused to certify to the company the lands described in the schedules of the bill, but held the lists suspended and unapproved upon the claim that the lands may be mineral in character, and as such excepted from the grant to the company, or that the lands may not have been free from claims or rights reserved in the grant, or that the question as to whether title to the lands had passed to the railroad company under and by virtue of the granting act, and acts amendatory thereof; that said matters were still in controversy, and pending before the commissioner of the general land office and the secretary of the interior.
 It is further alleged that the railroad company had no other right, title, claim, interest, property, or possession in or to any of the lands or premises described in the bill, except such right, title, claim, interest, property, or possession as it may have obtained under and by virtue of the acts and resolutions of congress, and its compliance with the conditions thereof.
 It is then averred that on March 7, 1889, the legislature of the territory of Dakota passed an act, which was duly approved by the governor of the territory, entitled 'An act providing for the levy and collection of taxes upon the property of railroad companies in this territory,' in and by which it was, among other things, enacted and provided: 'In lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this territory, or upon the equipment, appurtenances, or appendages thereof, or upon any other property situated within this territory belonging to the corporation owning or operating such railroads, upon the capital stock, or business transactions of said railroad company, there shall hereafter be paid into the treasury of this territory an amount equal to a percentage of all the gross earnings of the corporation owning or operating such railroad arising from the operation of such railroad as shall be situated within this territory, both upon territorial and interstate traffic, in case the railroad company owning or operating such line shall accept and become subject to this act as hereinafter provided.' That the railroad company did, within 30 days after the passage of this act, by resolution of its board of directors, attested by its secretary, filed with the secretary of the territory of Dakota, accept and become subject to the provisions of the act of March 7, 1889. That within 30 days of its passage the railroad company, as required by the act, prepared and filed with the treasurer of the territory, in the manner required by the provisions of chapter 99 of the Session Laws of the territory for the year 1883, an account of the gross earnings of the company, both territorial and interstate, for the years 1886 and 1887, and paid into the treasury the entire amount of taxes claimed by the territory on local and interstate earnings remaining unpaid at the time of filing such account for said years, such payment being as follows, to wit, for the last half of the year 1886, $38,095.31; for the year 1887, $65,585.46. Such sums so paid, as provided for in the territorial act of March 7, 1889, were percentages computed entirely upon gross earnings of the company derived from domestic business, the percentage for the same years computed upon the gross earnings derived from interstate business having been previously paid by the company, as required by the provisions of the territorial act of 1883.
 It was also alleged that at the same time the company paid into the treasury of the territory one-half of the entire amount due for the year 1888, amounting to $46,937.09, and that before August 15, 1889, it had paid the remainder of the amount due for the year 1888; that the sums so paid into the treasury for the year 1888 were percentages computed upon the gross earnings of the company for that year, derived from both domestic and interstate business, the former amounting to $11,446.78, and the latter to $82,427.40; and it was alleged that all the percentages derived from interstate business so paid into the treasury were not due from the company, except by virtue of the act of March 7, 1889, and the company's acceptance thereof, and that they were paid as a consideration for the exemption from taxation provided for by that act, and for no other reason.
 It is then charged that, notwithstanding the premises, in the year 1889 the county auditors for the counties of Kidder, Stutsman, Richland, and McLean, under the authority of the laws of the territory of Dakota, had assessed the company's lands situate in their respective counties for purposes of county taxation, and that they had advertised the lands as described in the schedules to the bill for sale, and were about to wrongfully sell the same for the nonpayment of taxes so levied, together with penalties and costs, and to issue certificates of sale for the same in the form prescribed by the laws of North Dakota, and, unless restrained by the order of the court, they would sell the lands, and issue certificates of sale thereafter, whereby the rights of the railroad company in and to the lands would be irreparably injured, and lead to a multiplicity of suits concerning the title thereto.
 It was further claimed on the part of the railroad company that the taxes so assessed and levied upon the lands were a cloud upon the title of the railroad company thereto; that, if sold, and certificates were issued to the purchaser, such certificates would constitute a cloud upon the title of the company in and to the lands so sold; that the counties were bankrupt; and that, if the railroad company should pay the taxes, and then bring an action against them to recover the amount thereof, it would require a multiplicity of suits, and such judgments as might be recovered would be worthless.
 The bill further averred that the amount of the taxes levied upon the lands, together with the costs and penalties claimed by the county auditors to have accrued thereon, and for which the lands had been advertised for sale and were about to be sold, were as follows: Upon the lands in Kidder county, $12,820.67; upon the lands in Stutsman county, $8,863.39; upon the lands in Richland county, $4,094.37; and upon the lands in McLean county, $4,048.17, the amount of such tax, penalty, and cost upon each tract of land being particularly shown in the schedules attached to the bill.
 The prayer of the bill was to the effect that the county assessments and taxes so levied upon the lands of the railroad company might be declared illegal and void, and a cloud upon the title of the company, and that the defendants, and each of them, their deputies and successors in office, be restrained from selling or attempting to sell the lands or any portion thereof, or from issuing tax certificates therefor.
 The defendants appeared, and demurred to the amended bill on the ground that, according to the showing made therein, the plaintiff was not entitled to the relief sought. The circuit court sustained the demurrer and dismissed the bill on the ground that the act of 1889 was void, because it violated the organic act, which provided that the legislative assembly of the territory shall not make any discrimination in taxing different kinds of property, but all property subject to taxation shall be taxed in proportion to its value; secondly, that the bill was without equity in failing to allege payment or tender of the gross-earnings tax for the year 1889. 47 Fed. 681.
 From this judgment the railroad company appealed to the United States circuit court of appeals for the eighth circuit, and that court, desiring instructions upon certain questions presented by the assignments of error filed in the cause, certified to this court various propositions of law as to whether the railroad company acquired such title to the odd-numbered sections of land within the place limits of the grant of July 2, 1864, which were not mineral, and which, at the dates of the grant and of the filing of the map of definite location in the office of the commissioner of the general land office, were not reserved, sold, granted, or otherwise appropriated, as to render them taxable before being patented and certified to the railroad company; whether the company was taxable on such lands by the territories after the filing of the map of definite location of its railroad, and full compliance with the terms and conditions of the granting act, while the United States refused to patent and certify such lands to the company; whether chapter 107 of the Laws of Dakota for 1889, being an act entitled 'An act providing for the levy and collection of taxes upon the properties of railroad companies in this territory,' approved March 7, 1889, was void as a regulation of interstate commerce; whether the act of March 7, 1889, was in conflict with the fifth and fourteenth amendments of the constitution of the United States, and with the organic law of the territory, as an attempt to exempt from taxation the lands granted by the act of July 2, 1864; whether the act of March 7, 1889, should be construed as granting an exemption for the year 1889, or to be in force and effect only after the year 1890. The eighth and remaining question certified is as follows: 'Is said bill without equity because of the failure to aver that the complainant has tendered or paid the 'gross-earnings tax' for the year 1889, and is said complainant entitled to the equitable relief prayed without first tendering or paying such tax?'
 F. M. Dudley, for appellant.
 [Argument of Counsel from pages 259-263 intentionally omitted]
 Edgar W. Camp and W. H. Standish, for appellees.
 Mr. Justice JACKSON delivered the opinion of the court.
 
 
 1
 In the view we take of the case, the answer to the last question will dispose of the suit, and render it unnecessary to enter upon the consideration and determination of the other propositions of law on which instructions are asked.
 
 
 2
 By an act of the legislature of the territory, approved March 9, 1883 (chapter 99, Laws 1883), it was provided that all railroad companies, except railroads operated by horse power, owned and operated within the territory, should pay 2 per centum on the gross earnings of their railroads for a period of five years, and thereafter 3 per centum on the gross earnings, in lieu of all other taxes upon said railroads and the capital stock and business thereof. The payment of this percentage was to be made at designated dates in each year, and penalties were imposed upon the companies faling to comply with the provisions of the law as to the making of returns of earnings and paying the percentages imposed by the act. The moneys so received and collected were to be apportioned between the territory and the several counties through which the railroads respectively ran.
 
 
 3
 This act of 1883 left the railroad companies no choice as to whether they would pay the designated percentage on their gross earnings, or remain subject to taxation upon their property in the ordinary method. It was compulsory upon them. It is not material to the present case to consider whether this act was constitutional or not; it was repealed by the act of legislature approved January 29, 1889. Now, it is shown by the bill that at the time the act of 1883 was repealed the appellant was in default of the payment of the percentages due upon its gross earnings for the years 1886, 1887, and 1888.
 
 
 4
 On March 7, 1889, the legislature of the territory of Dakota passed an act entitled 'An act providing for the levy and collection of taxes upon property of railroad companies in this territory,'[1] which went into force and effect immediately after its passage.
 
 
 5
 This act is by its terms nothing but a tax law, and, while it adopted the same rule of percentages on the gross earnings as provided in the act of 1883, it differed from that act, in not being compulsory upon the railroad companies, for it left to them the election as to which of two modes of taxation they should accept or submit to. It practically gave to the railroad companies the choice of having their property taxed as other property in the territory, by assessment and levy, or of taking the benefits of the act upon the terms and conditions provided therein. It was, by section 7, made a condition of the acceptance of the act that 'any railroad company assessed under chapter 99 of the Laws of 1883 shall, within thirty days after the passage of this act, pay into the territorial treasury the full amount of the taxes and interest due under the assessments under said Laws of 1883, including taxes on both territorial and interstate earnings, before they can avail themselves of the provisions of this act.' It was further provided that any company failing to strictly comply with the provisions of the act within the time provided should be immediately subject to assessment and taxation upon its property in the same manner as the property of individuals was assessed and taxed.
 
 
 6
 The companies accepting the benefits of the act were not only to pay arrearages under the law of 1883, but were also to pay a percentage of gross earnings for the current year of 1889, it being provided that, 'if such acceptance was filed on or before the 15th day of February in any year, such companies should pay one-half of said amount on said 15th day of February and the balance on the 15th day of August next following. Should such acceptance be filed before the 15th day of August and after the 15th day of February in any year, then an amount equal to three per centum of such account shall be paid in full on or before the 15th day of August in each year.'
 
 
 7
 It is shown by the bill that the appellant accepted the provisions and benefits of the act within 30 days after March 7, 1889, and it thereby became liable to pay the required percentage on its gross earnings on or before the 15th day of August, 1889. It is also shown by the bill that within 30 days after the passage of the act it paid the arrearages of percentages on its gross earnings accruing under the act of 1883 for the years 1886, 1887, and 1888; but it is not alleged that it made payment, or tender of payment, of the percentage on its gross earnings for the year 1889, or any portion thereof, although by the express provisions of the act a percentage on a portion of such gross earnings was due and payable on the 15th day of August, 1889.
 
 
 8
 The moneys to be received and collected by the territorial treasurer under this act from the railroad companies which accepted its provisions were to be apportioned between the territory and the several counties, respectively, through which the railroads run, or in which the companies had lands subject to taxation, in the manner pointed out in section 6 of the act. The several counties whose auditors are made defendants in the present case were therefore interested in the gross-earnings tax which the appellant was required to pay for the year 1889 in lieu of all other ordinary taxes upon its property.
 
 
 9
 The gross-earnings act remained in force until November 2, 1889, when it was repealed by the repugnant provisions contained in the constitution of the state of North Dakota, as adopted and approved by congress; and the claim is now made by the appellant that this repeal relieves it from liability to pay any percentage on its gross earnings for the year 1889, or any part thereof, because the same was not payable until after 1890; and that it was not liable to assessment and taxation on its property, because it had accepted the provisions of the gross earnings act of 1889.
 
 
 10
 This contention, if correct, would relieve the appellant from any burden in the way of taxation for the year 1889, but such a claim as this cannot possibly be sustained. The act of March 7, 1889, clearly intended that the gross-earnings tax therein provided for, as to all companies which would accept its provisions, should supply revenue for the territory and the counties for the year 1889. It is equally clear from the whole act, as a tax law, that the railroad company had to pay the required percentage on its gross earnings for that year, and that such percentage was payable in part on the 15th day of August in that year. It is not, therefore, correct to say that no part of the gross earnings was payable until 1890; but, if that were not the case, having accepted the provisions of that act, and thus becoming liable to pay the designated percentage of its gross earnings in lieu of taxes for the year 1889, that liability would not be discharged by the subsequent repeal of the gross-earnings act of 1889. If the company was released from the gross-earnings tax by the repeal of the act its property immediately became subject to assessment and taxation in the manner provided for the assessment and taxation of property of individuals in the territory, and it would not vitiate any such assessment made on the part of the counties that happened to be made prior to the repeal of the act of 1889. Such assessment would remain in full force and effect after the repeal of the act, and until satisfied.
 
 
 11
 It is next contended by the appellant that its payment of arrearages, claimed to be due under the act of 1883, was a consideration for the exemption of its property from taxation for the year 1889. This position cannot be sustained, for by the terms of the act of 1889 the payment of those arrearages was simply a condition upon which the railroad company was allowed to accept the benefits of that act, which was not an act exempting the property of the railroad company from taxation, but merely substituted one mode of taxation for another, upon the terms and conditions specified. One of the terms on which the railroad was allowed to accept the gross-earnings tax in lieu of the ordinary tax upon its property was that it should pay the arrearages which the territory claimed under the act of 1883. No exemption from taxation for the year 1889 was contemplated. The railroads accepting the act were required to pay the gross-earnings tax for that year in addition to such arrearages. It cannot, therefore, be properly claimed that the payment of these arrearages constituted a consideration for any exemption from taxation, or that such payment raised any equity on the part of the appellant against the payment of taxes for 1889, whether such taxes were imposed in the shape of a percentage on the gross earnings for that year, or in the shape of the ordinary assessment upon its property.
 
 
 12
 There is nothing in the allegations of the bill showing affirmatively that the company did not possess the equitable title or ownership in the lands described and assessed. Nor do the averments of the bill negative the fact that the appellant was properly chargeable with taxes on the lands coming within the grant of July 2, 1864, and within the limits of the line of definite location of its road. Payment of the gross-earnings tax imposed by the act of 1889 would have discharged all claims for taxes upon the company's lands for that year, but no ground is shown by the bill for releasing the appellant from the payment of either the percentage tax on its gross earnings or from the payment of the assessments upon its lands made by the county auditors. By section 7 of the act of 1889, its failure to promptly and strictly comply with the provisions thereof, and pay all sums therein provided to be paid, subjected the company to assessment and taxation in the same manner as individuals. It did not comply with the provisions of the act in paying the percentage of gross earnings due on the 15th day of August, 1889, and thereupon its property became liable to assessment and taxation as the property of individuals in the several counties.
 
 
 13
 Being liable to pay either the percentage on gross earnings in accordance with the provisions of the act of 1889, or the tax upon its lands, as other property of like character was assessed, the appellant was not entitled to any relief in a court of equity by injuction without payment or tender of what was due under one or the other of these modes of taxation.
 
 
 14
 In State Railroad Tax Cases, 92 U. S. 575, 616, 617, the rule is established that before an injunction will be granted in such cases as the present, a party must pay or tender what can be seen to be due on the face of the bill, and, speaking for the court in that case, Mr. Justice Miller said that the duty of making such a tender or payment before any injunction will be allowed is laid down 'as a rule to govern the courts of the United States in their action in such cases.' This rule was repeated in Bank v. Kimball, 103 U. S. 732, 733, where it was treated as a fatal objection to the bill that there was no offer to pay any sum as a tax which the party ought to pay, and, again speaking for this court, Mr. Justice Miller there said: 'We have announced more than once that it is the established rule of this court that no one can be permitted to go into a court of equity to enjoin the collection of a tax until he has shown himself entitled to the aid of the court by paying so much of the tax assessed against him as it can be plainly seen he ought to pay,' etc.
 
 
 15
 Applying this rule to the present case, it is clear that the appellant's bill was properly dismissed for failing to pay, or tender to pay, taxes which it ought to have paid on its property, or, in lieu thereof, a percentage of its gross earnings.
 
 
 16
 Our response, therefore, to the eighth question certified is that the bill was without equity, because of the failure to aver that the plaintiff had tendered or paid the gross-earnings percentage for the year 1889 (or the tax assessed by the county auditors), and was not entitled to the equitable relief prayed without first tendering or paying such taxes.
 
 
 17
 The answer of the court to that question will accordingly be certified to the circuit court of appeals for the eighth circuit.
 
 
 18
 Mr. Justice BREWER dissented.
 
 
 
 [1]
 Be it enacted by the legislative assembly of the territory of Dakota:
 1. Percentage of Gross Earnings to be Paid in Lieu of other Taxes.—In lieu of any and all other taxes upon any railroads, except railroads operated by horse power, within this territory, or upon the equipment, appurtenances,
 or appendages thereof, or upon any other property situated in this territory belonging to the corporation owning or operating such railroads, upon the capital stock or business transactions of said railroad company, there shall hereafter be paid into the treasury of this territory an amount equal to a percentage of all the gross earnings of the corporation owning or operating such railroad, arising from the operating of such railroad, as shall be situated within this territory, both upon territorial and interstate traffic, in case the railroad company owning or operating such line shall accept and become subject to this act as hereinafter provided.
 Every such railroad corporation or person owning or operating or that may hereafter own or operate any line of railroad in this territory which shall have accepted this act shall pay to said treasurer each year 'for the first five years' after the approval of this act an amount equal to three per centum of such gross earnings, 'and for and in each and every year after the expiration of such five years an amount equal to two per cent. of said gross earning,' and the payment of such amount annually as aforesaid shall be and is in full of any and all other taxation and assessment whatever upon the property aforesaid.
 Said payments shall be made, except as hereinafter provided, one-half on or before the 15th day of February, and one-half on or before the first day of August in each year. And for the purpose of ascertaining the gross earnings aforesaid, an accurate account of such earnings shall be kept by said company. An abstract shall be furnished by said company to the treasurer of this territory on or before the first day of February in each year, the truth of which abstract shall be verified by the affidavits of the treasurer and secretary of such company, and for the purpose of ascertaining the truth of such affidavits and the correctness of such abstracts, full power is hereby vested in the governor of this territory, or any other person appointed by law, to examine under oath the officers, employes of said company, or other persons, and if any person so examined by the governor or other authorized person shall knowingly or wilfully swear falsely, concerning the matter aforesaid, every such person is declared to have committed perjury; and for the purpose of securing to the territory the payment of the aforesaid per centum it is hereby declared that the territory shall have a lien upon the railroad of said company, and upon all property, estate, or effects of said company whatsoever, personal, real, or mixed, and the lien hereby secured to the territory shall have and take precedence of all demands, decrees, and judgments against said company.
 2. When Company shall Fail to Make Return.—If any such railroad company having accepted this act shall fail to make return of its gross earnings as aforesaid, or of any part thereof, at the time and in the manner provided by law, and such default shall continue during the period of thirty days, such company shall be subject to a penalty of an amount equal to ten per
 cent. of the tax imposed upon such company by this act, and the treasurer of the territory shall forthwith ascertain the amount of such percentage justly due from such company, as near as may be, from such evidence as may be available, and shall thereupon collect such amount so ascertained, together with the said penalty thereon.
 The amount so ascertained by the territorial treasurer as in this section provided shall, together with the said penalty thereon, be by him entered in the books of his office and such entry when so made shall stand in the place of the report required by law to be made by such company, and shall in all courts within this territory be evidence of the amount of such tax and penalty and of the other facts stated therein in pursuance of this act.
 3. Neglect to Pay Taxes.—In case any railroad company which shall have accepted the provisions of this act shall fail or neglect to pay the amount reported at the time and in the manner hereinafter provided, for a period of thirty days after the same shall have become due by the terms thereof, in such case there shall be added to the amount of such tax ten per centum thereof as a penalty for such failure or neglect to pay.
 4. Territorial Treasurer to Distrain.—At any time after the expiration of the period of thirty days after the amount as above provided has become due and payable under the provisions of this act, the territorial treasurer or his deputy shall distrain sufficient goods, chattels, or other movable property, if found within this territory, to pay the said amount due from such corporation, together with the penalty thereon as hereinafter provided, and shall immediately advertise the sale of the same in at least three newspapers published within this territory, stating the time when and the place where such property shall be sold; such sale shall take place at some point on the railroad of such delinquent company, and at least four weeks' notice of the time and place of such sale shall be given; such delinquent company, its successors or assigns, may pay in such amount and penalty at any time before the sale of the property distrained as herein provided, and thereupon further proceedings in connection with such distress shall cease, and the property distrained shall be delivered to the owner thereof.
 5. Land Subject to Taxation.—The lands of any railroad company shall become subject to taxation in the same manner as other similar property as soon as the same are sold, leased, contracted to be sold or leased; and on or before the first day of April of each year each railroad company having lands within this territory shall return to the county clerk of each county within this territory full and complete lists, verified by the affidavit of such officers of the company having knowledge of the facts, of all lands of such company situated within such county, sold, or contracted to be sold, or leased, during the year ending the last day of December preceding, and the list furnished on or before the first day of April, A. D. 1889, in compliance with the terms of this section, shall include a complete list of all lands sold or leased, prior to the last day of December, 1888.
 6. How Taxes Apportioned.—The moneys received and collected by the territorial treasurer in pursuance to this act shall be disposed of by him as follows: In case the railroad company paying such tax owns no land granted in aid of the construction of its railroad, one-third of the same shall be retained in the territorial treasury for the use of the territory, and the remainder shall be apportioned among the several counties into or through which the railroad or railroads of such companies run, in proportion to the number of miles of main track situate in such counties respectively. In case the railroad company paying such tax owns land granted in aid of the construction of its railroad, then thirty per cent. of the tax paid by such company shall be retained in the territorial treasury for the use of the territory, and forty per cent. shall be apportioned among the several counties into or through which the railroad or railroads of such company run, in proportion to the number of miles of main track situated in such counties, respectively, and thirty per cent. shall be apportioned among the several counties in which lands forming a part of its land grant are situated, in proportion to the number of acres of surveyed and unsold lands in said counties.
 7. Any Railroad Company.—Which, at the date of the passage of this act owns or is engaged in operating any line or lines of railroad in this territory, may at any time within thirty days after the passage of this act, by resolution of its board of directors, attested by its secretary, and filed with the secretary of the territory, accept and become subject to the provisions of this act, and provided that any railroad company which is now in arrears in the payment of taxes assessed under chapter 99 of the Laws of 1883 shall, within thirty days after the passage of this act, pay into the territorial treasury the full amount of the taxes and interest due under the assessments under said Laws of 1883 before they can avail themselves of the provisions of this act, by accepting its terms, including taxes on both territorial and interstate earnings. It is further expressly provided that any company failing to strictly comply with the provisions of this act within the term herein provided shall be immediately subject to assessment and taxation in the manner provided for the assessment and taxation of the property of individuals of this territory, and said taxes shall be collected in the same manner as is now provided in cases of the property of individuals. Any company which has not complied with the provisions of chapter 99 of the Session Laws of 1883, by paying all taxes claimed on gross earnings both territorial and interstate, or by filing an account of gross earnings both territorial and interstate, shall prepare and file such account in the manner therein provided within thirty days from the passage hereof, and pay one-half of the entire amount due under the agreement and acceptance herein referred to, for the current year, and also the entire amount of taxes heretofore claimed by the territory on local and interstate
 earnings of such companies, but remaining unpaid at the time of filing said account and within thirty days after the passage of this act, or the same shall not apply to such company or companies. The balance of said taxes due for the current year shall be paid to the territorial treasurer on or before the 15th day of August, 1889. Any railroad company that may be hereafter organized in this territory, or that shall hereafter become the owner of or engaged in operating any lines of railroad in this territory, may accept and become subject to the provisions of this act by filing a resolution of its board of directors in the manner as hereinbefore provided.
 In case any such railroad company shall accept and become subject to the provisions of this act, it shall at the time of filing such acceptance render an account of gross earnings both territorial and interstate, in the manner as hereinbefore provided, and shall pay at the time of rendering such account, all amounts claimed by the territorial auditor as tax due on the local and interstate earnings of such company for the current or any preceding year, and shall thereafter pay an amount equal to 3 per centum of such account, as follows: If such acceptance is filed on or before the fifteenth day of February in any year, such company shall pay one-half of said amount on said fifteenth day of February, and the balance on the fifteenth day of August following. Should such acceptance be filed before the fifteenth day of August and after the fifteenth day of February in any year, then an amount equal to 3 per centum of such account shall be paid in full on or before the fifteenth day of August in each year. Thereafter accounts shall be rendered and payment made in the manner provided in this act; provided, that any company failing to promptly and strictly comply with the provisions herein set forth and to pay all sums herein provided to be paid shall be subject to assessment and taxation in the same manner as individuals.
 8. In Case of Non-Acceptance.—The railroads and property of all railroad companies owning or operating lines of railway in this territory, which companies shall not accept and become subject to the provisions of this act, shall not be entitled to the exemption in this act contained, but shall be subject to taxation in such manner as shall be provided by law.
 9. Repeal or Amendment.—This act shall be subject to repeal or amendment by any future legislature, and nothing herein contained shall be construed as a repeal of any revenue law now in existence, as applicable to any railroad company which shall not accept the provisions of this act as herein provided.
 10. Effect, when.—This action shall take effect and be in force from and after its passage.
 Approved March 7, 1889.